That the complaint, by the appointment of the said Unitas Fratrum, hath been duly authorized by them to institute suits either in law or equity, in relation to the matters to be complained of — that they are bound and concluded by all such judgments and decrees as shall be given by the courts of this State, upon any suits which he may institute in relation to the same.
That Henry Cossart, who was agent for the Unitas Fratrum, known and admitted as such by the act of Parliament before spoken of, representing to the late Earl Granville that the Wachovia District, sold and paid for as good land, had been found to contain much poor land, had, on the 12th November, 1754, obtained, by way of retribution, two deeds of grant in the name of Henry Cossart, agent for the Unitas Fratrum, upon a plot returned into the land office by the surveyor of Wilkes County, wherein mention is expressly made that the said lands were surveyed for the Lord Advocate, Chancellor and Agent of the Unitas Fratrum, all of whom were officers, agents, and trustees of the same; which lands are described by butts and boundaries; the first tract containing 3,840 acres; the second containing 4,933 acres. That the lands were conveyed and granted to said Cossart in trust for the Unitas Fratrum, and not otherwise.
That Henry Cossart died before the Declaration of Independence, in the year 1776, leaving Christian F. Cossart, of Antrim, in Ireland, his heir at law, upon whom the lands descended, and who was seized thereof before the Declaration of Independence; that the said Christian F. Cossart, at the time of the said descent, was a subject of the King of Great Britain, residing in Ireland, and from that time hath continued and still is a subject of the said King, and since the time of the descent hath never come over to this State. That by the Declaration of Independence, the said C. F. Cossart became an alien to this State, by which, or by virtue of the confiscation laws passed in 1777, and at divers times afterwards, the lands held in trust, as to the legal title, are supposed to have become vested in the State. That the complainant (414) is advised that the lands having vested in the State, by a voluntary acquisition, in default of any legal proprietor, that the equitable interest which the Unitas Fratrum before had, was in nowise injured, impaired, or diminished; and that every person obtaining any grant or conveyance of the legal estate of said lands from the State, either with an intent of defeat the trust estate of the said Unitas Fratrum or with *Page 344 
notice of the Unitas Fratrum, or their trustees, equitable interest thereon, became seized of the said legal estate only in trust for the Unitas Fratrum.
That C. F. Cossart, after the descent of the said lands to him, on the 3d day of November, 1772, that the lands might be sold for the use and benefit of the Unitas Fratrum, executed a power of attorney to the complainant to sell and dispose of the lands in his name, and to appoint attorneys under him to carry the objects of the power into execution. The complainant was called to Europe before he sold, but previous to his departure, on the 4th day of October, 1774, he executed a power of attorney to the Rev. John Michael Graff, now deceased, being one of the members of the Unitas Fratrum, authorizing and empowering him to sell the lands descended from Henry Cossart to the said C. F. Cossart. That the said John Michael Graff, on the 22d July, 1778, articled to sell and convey to Hugh Montgomery, of Salisbury, the two tracts of land, for the sum of £ 2,500, procl. money, 8s. per dollar, to be paid in specie, and received of Montgomery £ 1,000 in part. That on the 23d July, 1778, by a deed duly executed to pass lands, John Michael Graff conveyed the lands to Montgomery, and for securing the payment of the residue of the purchase money, Montgomery demised the lands to Graff for a term of 500 years, with a proviso to become void if the money was paid. Shortly afterwards Graff died, and Traugott Bagge, of Salem, administered upon his estate, and knowing that the term of 500 years was vested in Graff in trust for the Unitas Fratrum, he, on the 30th December, 1784, assigned it to the complainant, agent and trustee for the Unitas Fratrum.
(415) That in all those transactions John Michael Graff considered himself, and was considered by Hugh Montgomery and the Unitas Fratrum, to have been acting as the agent and trustee of the Unitas Fratrum, and that the name of Cossart was used only because the legal estate of the land was supposed to reside in him. That Hugh Montgomery conveyed the land to trustees for the benefit of two infant daughters, and by his last will and testament charged his whole estate, both real and personal, with the debt due to the Moravians, which he directed to be paid in gold or silver.
That John Lovelass and others, pretending to derive title under William Lenoir, who obtained a grant under the authority of the land laws passed in 1777, are in possession of the lands. The bill then prays, that if the legal estate be vested in the defendants, that they be decreed to convey to the trustees of Hugh Montgomery, for the benefit of his daughters, and that the executors of Hugh Montgomery be decreed to pay the balance of the purchase money, and the interest due thereon. *Page 345 
To this bill the defendants demurred, and for causes of demurrer show that by the bill it is stated:
1. That Frederick William Marshall sues for himself and the concerns of an Episcopal Church (called by him the Unitas Fratrum) in this State. But the bill does not show what persons these are who, beside the said F. W. Marshall, have brought the suit, nor what interest they have respectively therein, nor indeed that they have any interest at all, in law or equity, to the lands sued for in and by said bill.
2. The said F. W. Marshall sets forth that by the appointment of the Unitas Fratrum he had been duly authorized to institute suits at law or equity in relation to the matters in the bill, and they are bound by the acts of the said F. W. Marshall to be obedient to any judgment or decree rendered on all suits brought by him on their behalf; and he further showeth in his bill that the lands now sued for were procured by Henry Cossart out of funds raised by active members of the society, on loan by their friends and able members of the society, for general concerns; and that as to the lands purchased in this State, the creditors were to receive payment in land, if they came over to (416) this country, or out of the sales thereof by him who had the fee; whereby it appears that if the lands held by Henry Cossart were held in trust, it must have been to convey to creditors who lent their money, and came to this State, or in trust to sell and raise money for such of them as did not come to this State, and are now aliens — or the estate must have been held in trust for a corporation of aliens, named the Unitas Fratrum. Yet who those creditors were does not appear, neither their names, places of abode, nor the sums lent by them respectively. Whether those creditors were the original lenders of the money, or whether they claim as representatives of such original lenders, does not appear; neither does it appear that the suit has been brought by them. or by any power from them, or any of them. And as to the society called the Unitas Fratrum, it is not stated that such society ever was incorporated; nor doth the said F. W. Marshall show by what legal means he has been authorized to sue, or in anywise act as agent of the Unitas Fratrum, who do not appear ever to have been legally incorporated, and who, as he saith, have no joint stock, funds, or revenue.
3. It appears by the bill that Henry Cossart, to whom the land in question was granted, was an inhabitant of Ireland, and it is not stated that he ever entered on this land, or that any person ever did enter thereon under any power from him. It also appears that the said Henry Cossart died, leaving Ch. F. Cossart, his son, a native of Ireland, and resident there, his heir at law; but it does not appear that the said Ch. F. Cossart ever did enter on the same lands, claiming the same as *Page 346 
heir, or that any other person acting by a power from him, ever did enter thereon in his name and to his use, so as to vest the said lands and estate of the said Henry Cossart in said Christian, as heir, etc.
4. It appears by the bill that Ch. F. Cossart, at the time of the Declaration of Independence, was an inhabitant of Ireland aforesaid, part of the dominions of the King of Great Britain, and it is not stated that he ever afterwards came to this State, or any of the United (417) States, and became a citizen, so as to enable him to hold real estate in this country. And that the sale of the land by John Michael Graff, as agent or attorney of said Ch. F. Cossart, to Hugh Montgomery was made in the year 1778, when said Ch. F. Cossart was an alien enemy.
5. It appears that the Unitas Fratrum is a religious society, and was so at the time of the purchase of Henry Cossart, and the grant made to him of the lands now sued for; yet it is not stated that license from the King of Great Britain was obtained to enable him to make such purchase in trust for the Unitas Fratrum.
Wherefore, and divers other good causes, the defendants do demurrer, etc.
This bill would be no bar to a suit brought by the Unitas Fratrum, when they were properly named. 1 Bla. Com., 467. If they are not a corporation, then they must be severally named. If there be no joint stock or revenue, how can Marshall be appointed to sue for them? It is said that he does so by virtue of and act passed in 1782 (see in Martin's collection of private acts the act to vest in F. W. Marshall all the lands, etc.) — there is no power given to him by this act to sue for the Unitas Fratrum.
No persons should be harassed by a suit which does not finally (418) settle the question; and if a decision be made for the defendants they are unsafe, because they may be disturbed by another suit. *Page 347 
If the complainant sues by appointment, it will be proper to inquire by whom he is appointed — and it does not appear that it was either by those who lent the money or the society at large. The question here is independent of the first deed, but arises on the second, which was made by way of retribution. The bill states that it was made for the Unitas Fratrum — upon the face of it, it was made for Cossart. The parties to the bill, and those for whom the deed was made, are at variance. It would be highly unjust to decree the lands to the complainant for the Unitas Fratrum generally, as those who lent the money are alone entitled to have them. On the 3d cause of demurrer I shall make no remark.
The 4th cause of demurrer states that Christian Frederick Cossart was an alien — that he never came to this State. And the conveyance from Graff to Montgomery, being in 1778, shows that the complainant, and those for whom he sues, have no right either in law or equity. It is of importance here to inquire who had the right to the lands on the fourth day of July, 1776; on that day I contend they escheated, and if they did not escheat, that they were afterwards confiscated.
Whenever there ceases to be a person who can legally take and (419) hold the land it escheats. 1 Black. Re., 133. The case ofBayard v. Singleton, in New Bern Superior Court, was determined on the ground that at the time that Cornelle executed the deed to his daughter, under whom the plaintiff claimed, he was an alien, and not entitled to past lands; consequently, that the lands had escheated, and escheats are recognized by the laws of this State. (See the Acts of 1715.)
If the land had escheated, it then becomes necessary to inquire, In what manner has the State taken? I contend that the land is taken by the State, exempt of any trust — for in England, when the Lord or King takes by escheat, they take discharged of the trust. 1 Coke's Rep., 122, Chudleigh'scase. Before the Statute of 27 Henry, 8, whenever feoffee to uses did anything which produced escheat, the land reverted to the *Page 348 
Lord discharge of the trust. Uses and trusts are substantially the same. 1 Bl. Rep., 180, 182; 1 Alk., 591; Hardress, 491. The same doctrine which governed uses now governs trusts — all the cases which will be read on the other side are mere obiter dictums.
The case of Eales v. England, Eq. Ca. Ab. and Finch's Prec. in Ch., 200, have no application to the present case.
I shall now speak of the operation of the acts of confiscation on this case. The acts of the General Assembly, to be found in Iredell's Rev., pages 341 and 364, show what lands the State intended to seize, and to what uses the State seized them. The land in contest is completely within the operation of these acts. Cossart did not embrace the opportunity of becoming a citizen, and thereby holding the land, as he might have done; he chose to remain abroad, and the loss is a consequence resulting from his own conduct. Confiscation of property belonging to people of a certain description was an high act of sovereignty, executed by the representatives of the free men of this State in a moment of severe pressure; and, however hard the operation of this law may be on Marshall and his associates, yet, as it is the omnipotent fiat of a sovereign and independent people, the Court cannot say that the (420) State took the lands for any other uses than expressed in the laws by which the property is acquired.
A demurrer admits the truth of the facts stated in the bill. If this be a true rule, then, it sufficiently appears that the Unitas Fratrum have an interest in the land. There are many exceptions to the general rule, that all parties ought to be joined. If it were adhered to, it would frequently prevent the administration of justice. The Unitas Fratrum constitute a voluntary society, and not a corporation, and the lands acquired by them are vested in one for the use of the whole; and the suit being brought by Marshall for them, they are substantially parties. The case from Prec. in Chancery, 592, was the case of a voluntary society, and shows that a few may sue for the whole, and it is not necessary to make all parties by name, where they claim one general trust.
As to the second cause of demurrer, Is it to be supposed that those who lent money to purchase the Wachovia settlement are still unpaid, and that they still have a lien upon the land? Certainly not. If the lenders of the money came to America, they were to be paid in land; if they remained in Europe, they were to be paid the money advanced, with the interest. It cannot be supposed that those creditors had any lien upon the land; if they had, they must have joined in the conveyance of it. The complainant states that he is authorized to bring suits in law and equity for the Unitas Fratrum, and the demurrer admits the truth of the *Page 349 
allegation; and it can only be denied by plea or answer. If it be not necessary to state the names of each individual, then also it is unnecessary to state their respective interests.
As to the fourth cause of demurrer, Mr. Henderson has contended that the land escheated and became discharged of the trust; this is denied on the part of the complainants.
At the time of the Declaration of American Independence, this was a part of the mother country; and before that event, any of (421) the subjects of the King of Great Britain were entitled to purchase and to hold lands in this or any of the United States. When independence was declared, Cossart became an alien to this State, but I contend that his alienage worked no forfeiture of his estate. When the war broke out those who did not like the new government were at liberty to sell their lands and retire with the proceeds where they pleased; and this is agreeable to the law of nations. Vattel, B. 1, sec. 33, 195. This doctrine seems to have been held in view by the framers of the Constitution. Iredell's Rev., 276. Declaration of Rights, sec. 25. This section only charges the sovereign, and by it no escheat can take place, and aliens may still take and hold lands. This section provides that the titles made by the King and the Lords Proprietors shall not be affected; and the General Assembly of this State have shown that they were under the influence of this opinion, as appears from the 3d chap., Acts 1777. Iredell's Rev., 284, 285, by which, in substance, it is enacted that those who leave the country may sell their property and export the proceeds in any kind of produce, naval stores excepted; but if any real estate remained unsold three months after the departure of such person, that it should be forfeited to the use of the State. It was clearly considered that by the Declaration of Independence no forfeiture of lands was produced. In November, 1777, Iredell's Rev., 322, they again had liberty to sell. On page 341 we find the Confiscation Act: By this it was considered that on the 4th day of July, 1776, persons therein described held lands in the State, and continued to hold them without escheat till they were confiscated; and it was thereby enacted, that unless the absentees appeared by the time therein limited to become citizens, their lands should be confiscated. These acts are the expositors of the Declaration of Rights and of the Constitution, and ought to be regarded. According to Lord Coke, expositions made of an instrument at or about the time of its passing or creation, are the best and strongest expositions.
There is another act in Iredell's Rev., 364, which refers back (422) to the 4th day of July, 1776, and prevents any improper conveyance in the meantime; and declares the lands of all persons of the description of those mentioned in the Acts of 1777 to be absolutely forfeited. *Page 350 
At the termination of the war a treaty was made between the King of Great Britain and the United States of America, which proves that the lands were not considered as escheated. Art. 6 (the words are): "There shall be no future confiscations." If the lands had escheated by the change of government, there would be nothing left for this article to operate on.
By the private act passed in 1782 we have a legislative declaration that the lands of the Moravians, and this tract particularly, are not considered as confiscated. Cossart is not named in any of the confiscation acts, and although of that general description of persons whose lands were intended to be confiscated, yet he has never been proceeded against in such manner as to divest him of his right; and until he hath been found by inquest to be of the description of persons named in the act, his lands are not confiscated.
Although we should not be able to show any cases to prove that the king or lord took the escheat subject to the trust, yet, as this is a court of equity, the relief asked for by the complainants ought to be extended to them. If the feoffee and his heirs are bound to perform the trust, why is not the lord or the State bound also to execute it? The lord cannot show that he is entitled to the escheat till he shows that he made a grant, and that his tenant died, or committed some crime for which he is attainted. Why, then, should the lord say, because the feoffee is dead, the cestui quetrust shall be deprived of the estate?
In the case of Eales v. England, Finch's Prac., ch. 200, the trustee died without heir, and the lord took the estate subject to the trust. This is a case of modern decision, and overrules the opinion that the king or the lord takes discharged of the trust. It is laid down in 1 Eq. Ca. Ab., 384, that no act of the trustee shall prejudice the cestui que trust. Hence, it follows that the rights of the cestui que trust remain (423) unimpaired, whether the trustee continues to execute the trust himself or whether by his death or attainder the estate devolving upon the lord carries with it and fastens upon him the duty of executing the trust.
Mr. Williams, further to show that if the State took the lands it was subject to the trust, cited 2 Plow., 488; Pet. of Right — 2 Bla. Com., 329, 330; 5 Bac. Abr., 360, pl. 50, 393, pl. 1; 1 Harr., 29; 1 Eq. Ca. Ab., 384 [D], pl. 1 in Margine; 1 Bla. Re., Burges v. Wheate. He made no remarks on the 3d or 5th cause of demurrer.
It has been contended that Cossart became an alien to this State; that the land escheated, and that the State has taken it discharged of the trust. I will first considered what is an escheat; it does not arise in consequence of alienage, it happens where the tenant dies without heirs, or attained of a crime which corrupts his blood, and destroys the inheritance. 2 Bla. Com., 241; 1 Bl. Re., 132, 133, 143, 164, 174, 175, 184, 185. It is a confusion of terms to say that lands escheat for alienage, and by forfeiture; because in the one case the land goes to the lord, in the other to the king.
Escheat is a consequence of feodal tenure; no such tenure existed in this country at the Declaration of Independence. When the lands of this country became allodial, feodal tenures ceased, and with them escheats also. If it be considered that the State took the land by forfeiture, and not by escheat, then the authorities cited to show that where, in cases of escheat, the lord takes discharged of the trust, fail of application in the present case.
Where an alien purchases lands, he may hold till an office found; and the reason why in England it is necessary is that the people (424) being jealous of the power of the king, procured it to be declared by Magna Charta that the king should not take till an office found. Hardress, 495; 2 Vesey, 541; Co. Litt., 2 [6]; Dyer, 283; 5 Repts., 52; 3 B. C., 259; 3 Mo., 101; 5 Re., 110; 3 Inst., 254; 2 Inst., 169; 2 B. C., 294. The State of North Carolina had no right to take the land till an office found that Cossart was an alien, and now the time to show that fact is past. Moreover, the Legislature, in 1782, clearly expressed their determination that they would take no advantage of Cossart's alienage.
Suppose, then, that the land came to the State by confiscation, yet it must take it with the trust attached to it, and the alienees of the State must take it subject to the trust, because they had no notice of the claim of the Unitas Fratrum; they cannot show that the trust was separated from the land when it came to the State. Cossart's title was merely nominal — a trustee for the Moravians; and the State taking his right stands in his place, and is their trustee; and it was certainly so understood when the General Assembly, by the Act of 1782, declared that the confiscation should not extend to the lands of the Unitas Fratrum.
All the cases cited to prove that the king takes discharged of the trust are mere dictums, laid down out of complaisance to the king; but the more modern decisions show that the king can be a trustee. 1 Vesey, 453; Saunders on Uses and Trusts, 192. And although the king cannot *Page 352 
be sued, yet his alienee may be, for he does not partake of his privileges or immunities.
Suppose that neither the State or alienees are suable, yet the trust attaches upon the estate in the hands of the tenants, and the court will appoint some person to execute the trust. Saunders, 116, establishes the rule that the disability of the trustee shall not prejudice the trust, and the court of chancery will proceed as if there was a trustee.
As to the objection for want of parties, the demurrer is a silent thing — you cannot take more into view than is disclosed by the bill; no persons are mentioned in it but the Unitas Fratrum of this State; (425) and no history of Moravian settlements which shows that there are others of the society in Europe ought to be regarded or allowed to affect this case. I would ask, Could the lenders of this money come into court and demand a conveyance of all the land? Certainly not. Theirs is only a personal contract, and if their money was not paid to them, they might recover it, unless they chose to take the land according to stipulation. A judgment in this case will be conclusive, and will bar any others of the Moravians from bringing suit respecting the property in question. Marshall is their attorney — his acts bind them as well when they are generally described as when particularly named.
Duffy, in reply. It is insisted by the complainant's counsel that the title of Christian F. Cossart is saved by the bill of rights; the true rule is that you must construe the section according to the subject matter of the context — the individuals mentioned must mean the citizens of North Carolina, and not aliens. If the construction was otherwise, then almost all the lands of this State would be monopolized by aliens, and the claim of Lord Granville and his heirs would thereby be revived. The acts of confiscation, so far from supporting the construction contended for, show that at the time they were passed the Legislature considered that from the 4th day of July, 1776, those persons had lost their rights; because it is declared that they "may return and be restored to the possessions which to them once belonged." And although acts of confiscation were passed, yet they seem to be more out of abundant caution than intended to operate on what had before that time escheated.
It has been argued that Cossart's title has never been extinguished, because no office has been found; I contend that has been done which is equal to an office found, viz.: By the Declaration of American Independence, and its subsequent confirmation, the land escheated; and the passing of the Act of 1778 is an express taking away of his right.
The only case where the king takes subject to a trust is where (426) there is a forfeiture, and not where there is an escheat. In the one case he takes under the tenant; in the other he takes by title *Page 353 
paramount, for the want of heritable blood. It is certainly the opinion of the complainants that the lands in question have either escheated or have been confiscated; otherwise, C. F. Cossart might bring an action of ejectment against the tenants, and recover the possession.
Henderson, in reply. Does Marshall, the complainant, show that he is of the Unitas Fratrum — that he is interested in the matter in dispute? He certainly does not. It doth not appear that he hath anything more than a mere appointment, which cannot give him any right to sue in his own name. The bill is defective, inasmuch as it doth not show that the lenders of the money ever came to this country and received lands, or that their money has been repaid.
I am inclined to think that the position which maintains that an alien loses his land by forfeiture in England is correct; and the true reason seems to be that it is a punishment on him for his presumption in purchasing lands which he cannot hold. But it is otherwise where the lands escheat for the want of heritable blood, and then they go to the lord.
If land be purchased by one who dies without issue, it escheats. Why not escheat where he dies leaving a person incapacitated by law to take? Whenever land is taken by forfeiture, it vests immediately on the purchaser; but it does not escheat till the heritage blood fails. Mr. Haywood admits that the State took in 1776 by forfeiture, but he alleges it took subject to the trust; but the State has expressly declared that she exonerated herself from the trust, and would not execute it; and this conclusion results from the Act of 1779. The fact of Cossart's absence from the United States is admitted by the bill, and that he never returned is also admitted. It then follows that there can be no necessity of having an office found to establish a charge the truth of which is admitted.
The inference drawn from the last section of the private act passed in 1782 is, in my opinion, directly against the complainant — it shows that the General Assembly considered the title of the State to the (427) land in Wilkes as good, and that they intended nothing more than to authorize the registration of the power therein mentioned. If anything more than this was intended, they would certainly have used the same operative words as are used in the sections which confirm the lands conveyed by Hutton and Medcalfe.
If all the authorities cited yesterday are to be overruled by precedents in chancery, then it is useless to show what the law has been for three or four hundred years. The hardship of the case is entirely out of the question, and arguments which are built upon it ought to be disregarded. The Court cannot supply the place of a trustee when the land escheats, as they may do in the case of corporations. If the trust is dead, 'tis *Page 354 
useless to supply a trustee — it would be better to show how the trust can be revived than to devise a way to supply a trustee. It is useless to show that the alienees of the State can be sued without showing that they took the trust along with the legal estate; for as the trust was extinguished before the alienees took, the land passed discharged of the trust; for the State cannot hold in trust for aliens. Gilbert on Uses, 43; 1 Co. Re., 122; Har., 495.
The bill is brought by F. W. Marshall, who sues for and in behalf of himself and the concerns of the Unitas Fratrum in this State. To this bill there is a demurrer, in which one cause of demurrer set forth is that the bill does not show what persons those are that (besides the said F. W. Marshall) have brought this suit.
At the same time that the demurrer was argued, a motion was made by the complainant's counsel for leave to amend the bill, in case it should be thought by the Court that the cause of demurrer before stated was a good one. I will first consider whether it will be proper to grant leave to amend the bill. Wherever the Court has power to permit an amendment to be made, it is better to exercise it than to suffer a suit to go off, upon an objection to form, or indeed any objection in which the (428) merits of the cause are not involved. A plaintiff may amend his bill upon payment of costs of the demurrer. Wyatt's Register in Ch., 68. After argument of a demurrer to the whole bill, and the demurrer held good, it is not usual to allow an amendment, because the bill is regularly out of Court. But from this rule of practice it seems there are some exceptions; one is, in case of a demurrer for want of parties; in this case an amendment has been permitted to be made, although upon argument the demurrer has been held good. 2 Ch. Ca., 197; 2 P. W., 300; Wyatt's Register in Ch., 164.
This case has been set for hearing upon bill and demurrer — it has been argued; but as yet the Court has given no opinion. I feel myself authorized, at this stage of the proceedings, to allow the bill to be amended, upon the complainant's paying the costs of the bill, and one fee for counsel. The leave given to amend the bill arises from a conviction that this part of the demurrer would prove fatal to the bill, in case it was to rest on that issue alone. Although it may not be necessary to give the reasons on which that conviction is founded, I will do it in a concise manner, as all the Court have not the same impressions with respect to the demurrer. Here two questions arise: (1) Was it necessary that the names of all or any of the individuals composing the U. F. should have been mentioned by name in the bill? It is regularly true that all persons interested should be made parties by name, because, although a decree *Page 355 
may be made if that is not the case, yet none but parties, and those claiming under them, are bound by it. 1 Harrison's Cha., 32, 6 Ed. This is a good general rule and, like most others, stands proved by its exceptions. Those exceptions are founded on necessity, and the impracticability of obtaining justice in many cases by a strict adherence to that rule, where there are a great many persons all interested in the same way. If it was indispensably necessary to make them all parties by name, there would, in all probability, be so many abatements by death, etc., that it would be extremely difficult ever to come to a final determination. 2 Eq. Ca. Ab., 167. It is said by Lord Ch. Hardwicke, in the (429)Mayor of York v. Pilkington and others, 1 Atk., 282, "that a bill may be brought against tenants by a lord of a manor for encroachment, etc., or by tenants against a lord of a manor as a disturber, to be quieted, etc. As in these cases there is one general right to be established against all, it is a proper bill — nor is it necessary all the commoners should be parties. So, likewise, a bill may be brought by a parson for tithes against the parishioners, or by parishioners to establish a modus, for there is a general right and privity between them, and, consequently, it is right to institute a suit of this kind."
The case in 2 Browne's Rep., 338, was a case where it was thought practicable that all the parties, to wit, the part owners of the ship, might be named in the bill; and whenever that is the case, it is proper to name them. But whenever it is not practicable, with a view to settle the rights in question, it is unnecessary to make all the individuals parties by name — and with this principle I think common reason and the authorities I have seen on the subject accord. I therefore think that in the case now before us, where the individuals composing the U. F. are so numerous, that to require that each individual should be named as a complainant would so much embarrass the future progress of the suit, and subject it to so many unavoidable delays, as to amount nearly to a denial of justice; and, of course, that such a requisition ought not to be made. Although, for the reasons before stated, I do not think in some cases that all persons should be made parties by name, yet I think some of them ought; and that in the present case some of the individuals composing the U. F. should have been mentioned as complainants. The inconvenience of making all of them parties by name does not hold good against the requisition that some of them should be made parties by name; and in proportion as the reason fails, on which the exception as before stated is founded, so in proportion ought the rule that all persons interested should be made parties by name be adhered to. A bill may be brought by a few creditors on behalf of themselves and the rest; the names of all of them need not be mentioned, but the names *Page 356 
(430) of some of them must. If the names of some of them are not mentioned, it is certainly a good cause of demurrer; and there can be no aid decreed from the circumstances that the name of their agent is mentioned in the bill who sues on their behalf. A bill cannot be brought by an agent in his own name, it must be brought in the name of his principal. 2 Vesey, 313. I therefore think that the names of some of the individuals composing the U. F. ought to have been expressed.
(2) What interest does it appear from the bill F. W. Marshall has in the property in dispute? Or, in other words, is it to be collected from the bill that he is one of the U. F.? The bill expresses that the suit is brought by F. W. Marshall, on behalf of himself and the concerns of the U. F. in this State. From this expression it appears that whatever his interest may be, it is distinct from that of the U. F. If he was one of the U. F. and sues in that character, it certainly is not so expressed — it is stated not only that he sues on behalf of the interest of the U. F. which interest, to wit, the interest of the U. F., comprehends his own, if he sues as one of them; but further expresses that he sues on behalf of himself. Now, if he sues on behalf of himself, as one of the U. F., the expression means nothing more than is to be collected from the one immediately preceding it, where he says he sues on behalf of the interest of the U. F. Suppose it was asked and ascertained what his interest was, would that satisfy a desire to know what the interest of the U. F. was? Or, suppose it to be known what the interest of the U. F. was, could that be relied upon as a certain knowledge of what the interest of F. W. Marshall was?
It appears from other parts of the bill that C. F. Cossart, after the descent of the lands in question to him, executed a power of attorney in the year 1772 to F. W. Marshall, empowering him to sell, etc., said lands, and also authorizing him to constitute other attorneys. That in 1774 F. W. Marshall executed a power of attorney to John Michael Graff, who sold such lands to Hugh Montgomery. That Hugh Montgomery, (431) by deed, etc., demised the said premises to the said John M. Graff, for and during the term of five hundred years, with a proviso, etc., that the same should be void upon the payment of the purchase money. That the said John M. Graff afterwards died. That Traugott Bagge became his administrator. That he assigned the said term to F. W. Marshall, then and now the agent and trustee of the said U. F. It is again expressed that, by the appointment of the said U. F., the said F. W. Marshall hath been duly authorized to bring suits, that the U. F. are bound by all judgments rendered in such suits. Thus it appears what interest F. W. Marshall really has. In the first place, he *Page 357 
is agent for selling the lands; in the next, for instituting suits. If he brings this bill as agent, etc., for the U. F., but not in their names, or the names of any of them, we have already seen that the suit is not well brought. It did not follow that because he was an agent for the U. F. that he was one of them, because that agency might as legally have been intrusted to a person that was not as to a person that was of the U. F. If he sues as assignee of the term of five hundred years, that is an interest distinct from that claimed by the U. F. In another part of the bill it is stated that he has the fee; if so, the U. F. has it not, so that that is an interest distinct from theirs. He may act as agent, etc., be possessed of the term, etc., or have the fee, etc., and still not be one of the U. F. If he is one of them, those interests are distinct from that claimed by them. I conclude that it does not appear from the bill that F. W. Marshall was one of the U. F., and that had leave not been given to amend the bill, this part of the demurrer must have proved fatal to it. The first cause of demurrer goes on to state that the bill does not set forth what interest they (the individuals composing the U. F.) respectively have; nor indeed that they have any interest at all, in law or equity, to the lands sued for. The bill expressly states that the lands in question were conveyed and granted to Henry Cossart in trust, etc., and thereforward held the said land as trustee for the said U. F. and not otherwise. The facts stated in the bill must, at this stage of the proceedings, be received and taken as true; if so, what interest (432) the U. F. has clearly appears from the bill.
With respect to the second cause of demurrer, this is not a dispute between the lenders of the money and the complainants. How could the complainants comply on their part, viewing the interest of the lenders of the money in the light in which the demurrer places it, unless they had the fee, either to make payment with, if the lenders of the money came over, or to sell by him who had the fee. The bill does not state that the land was held in trust for the lenders of the money — a recovery in the present instance cannot prejudice any right which the lenders of the money may have. The U. F., whether incorporated or not, appear to have been recognized by the Legislature of this State in the year 1782 as having an existence, and capable of having lands held in trust for them. Martin's Collection of Private Acts, 105. The preamble of this act states that, "Whereas, F. W. Marshall hath made it appear to this General Assembly that all the tracts of land within this State belonging to the Lord Advocate, the Chancellor, and the agent of the U. F. or United Brethren, have been transferred to him from the former possessors in trust for the U. F." And the act then goes on and, after *Page 358 
declaring some deeds to be valid and directing them to be admitted to probate, vests certain lands in F. W. Marshall in trust as aforesaid.
As to the 3d and 4th causes of demurrer, it appears from the bill that the lands in dispute were conveyed to Henry Cossart, as agent, etc., in the year 1754, and that no adverse claim has been set up until that on which the defendants now rely, or that from which they attempt to derive title. That C. F. Cossart, to whom the lands descended, was, at the time of the Declaration of Independence and ever afterwards, a subject of the King of Great Britain. I suppose it cannot be contended but that these lands were legally held by the Cossarts until the Declaration of American Independence. Immediately after this declaration, the State of North Carolina, like the other states in the Union, became a sovereign and independent State, and chose for herself her present form of (433) government. In the 25th section of the Bill of Rights it expressed "that the property of the soil in a free government, being one of the essential rights of the collective body of the people," it is necessary, in order to avoid future disputes, that the limits of the State should be ascertained. After ascertaining the limits, etc., it is further expressed that "all territories, seas, etc., therein are the right and property of the people of this State, to be held by them in sovereignty." In the third proviso of the same section it is further expressed "that nothing herein contained shall affect the titles or possessions of individuals holding or claiming under the laws heretofore in force, or grants heretofore made by the late King George III, etc., or the late Lords Proprietors, or any of them." Thus, the people of this State assert their claim to the territory, etc., included in its boundaries, but without prejudice to titles or possessions held, etc., as in the said proviso set forth. Next come the acts of confiscation, designating what persons are not citizens; and for the reasons set forth in their preambles, confiscate the property of people of certain descriptions. Among persons of the description whose property was confiscated was C. F. Cossart, the person who it is stated in the bill held their offices in trust for the U. F. It has been argued for the defendants that, inasmuch as the heritable blood of the said Cossart became extinct and he and his heirs could no longer hold the lands, the State took them by escheat, not subject to the trust of the U. F., and that the State had a right to grant them to the defendants, not subject to the trust; and the doctrine of escheats in England is relied upon. In England escheats are divided into those propter defectum sanguinis and those propter delictumtenentis. The one sort, if the tenant dies without heirs — the other, if his blood be attained. 2 Bl. Com., 245. It cannot be pretended that the lands in question escheat to the State as coming within the latter description, propter delictum tenentis, because, although *Page 359 
a nation has a right to change its form of government, yet any individuals of that nation are under no obligation to submit to such change; they have a right to retire elsewhere, sell their land, etc., (434) and take with them all their effects. Vattell, b. 1, ch. 3, pa. 30. In conformity to this principle, the Legislature of this State gave leave to such persons as were ordered out of the State to sell and dispose of their estates, etc. Iredell, 286. It could not then be said that persons who did not wish to submit to the form of government of this State, and withdraw their allegiance from the King of England, were guilty of any crime. The other sort of escheat is where the tenant dies without heirs. Is that the case in the present instance? Does it appear that C. F. Cossart died without heirs? It does not. The fact appears to be that he did not die without heirs; but that he became incapacitated to hold lands in this country some time after these lands descended upon him, because he continued to be a subject of the King of Great Britain. This case has no parallel that I am aware of in the English books. Lord Keeper Henly says, in Burges v. Wheate, 1 Bl. Rep., 178, that if lands do escheat, not subject to a trust, he supposes it no injury or absurdity at all, volenti non fit injuria. The creator of the trust determines to take the conveniences of the trust with its inconveniences when this trust estate was created. What was the security of the U. F. against a loss of it by an escheat of the legal estate? That the trustee would not die without heirs — that he would commit no offense in consequence of which his blood should be attainted. It is true, if the trustee conveys the legal estate for a valuable consideration to a purchaser without notice, the trust estate may thereby be destroyed; but this depends upon other and quite different principles. At the time this trust estate was created, it was not contemplated that any acts of confiscation would form the medium of escheat, and thereby operate a loss of the trust estate to the owners thereof, against whom it is not pretended the confiscation laws were ever intended to operate. Suppose that before the revolution, either in England or in this country, a law had passed declaring that persons of any particular description should no longer hold lands in this country; if the Lords Proprietors had seized upon lands thus situated, I think they would have taken it with its encumbrances. It (435) is not that I imagine that the State has a right to take a greater interest, or a larger estate, than the Lords Proprietors could have done. With what intent did the Legislature of North Carolina pass the acts of confiscation? And what was the mischief which existed at that time? And what was the remedy intended to be applied? For such a construction ought to be put upon a statute as may best answer the intent which the makers of it had in view. 4 Ba. Ab., 647. And that intent *Page 360 
is sometimes to be discovered from the cause or necessity of making an act of Parliament, etc., and sometimes from foreign circumstances; when this can be discovered, it must be followed with reason and discretion in the construction of an act, although against the letter of it. Idem., 648. The motives by which the Legislature were actuated in passing these laws are set forth in the preamble of one of them — Iredell, 341 — that "whereas divers persons, who have heretofore owned and possessed lands, etc., in this State, have withdrawn themselves from the same, and attached themselves to the enemies of the United States of America, etc., and also divers persons having been beyond the bounds of the United States at the beginning of the present war, have failed to return and unite their efforts for the common defense of American liberty; and it is expedient and just that every person for whom property is protected in any state should join in defense thereof whenever the same is threatened or invaded." Time is then given to persons whose situations are described as above, alleging favorable circumstances, to become citizens, etc., otherwise their property is to be confiscated. Thus we at once see their intent in passing the law, the mischief which prevailed, and the remedy intended to be applied. I see no reason for believing that the Legislature intended that the acts of confiscation should operate upon persons of any description except those described in the preamble of the act. Their objects was to hold out inducements to them to remain with us, by darkening and rendering as gloomy as possible their prospect in case they left us and sought to attach (436) themselves to the enemies of our country. The avowed object of these acts was to increase the security which the citizens of the State had to their rights; by no means to impair it. C. F. Cossart was one of those persons described in the confiscation laws; his property was confiscated, it was said, and of course the legal title to the land in question; be it so. Was it the object of the Legislature to confiscate any rights, etc., but those of which he was possessed? If not, the operation of the acts of confiscation is commensurate to the causes which gave birth to them, and the remedy rationally proportionate and equal to the mischief. If, however, their operation is extended further, and made to include the rights of our own citizens, persons not described in the preamble I have just recited, but persons for whose benefit, in common with other citizens, the confiscation laws were passed, such extension of their operation can have no corresponding cause in that preamble, nor can be reconcilable with any motive that actuated the Legislature upon that occasion. Their object certainly was to secure, not to destroy the rights of their own citizens. Let us suppose it a doubtful case, and suppose also that the Legislature were present, and the question put to them, Did you intend *Page 361 
to injure the rights of your own citizens by passing the confiscation laws? Let such an answer be given as it may be supposed they, being upright and reasonable men, would give. 4 Bac., 649. No person can imagine that the Legislature would say that, without any cause, they intended to sacrifice their fellow citizens; for I can venture to believe that if such a sacrifice was to be made, it would be without cause. Suppose all the persons whose names have been mentioned, or whose property has been confiscated, in and by the confiscation laws, to have been naked trustees without any beneficial interest, could the Legislature have thought that those trustees would be affected one way or the other by the confiscation laws? The beneficial interest, in the present instance, is in our own citizens, nothing but a naked and unprofitable title was in C. F. Cossart. The Legislature, in all probability, knowing this, have not thought proper to make mention of his name in any of the acts of (437) confiscation. I suppose the facts to be that all the persons who are mentioned by name in the Confiscation Act of 1779, Iredell, 379, not only had the legal estate in them, but had also the beneficial interest attached to it; at least that the Legislature supposed that to be the fact by a general expression — the act then includes "all others who come within the meaning of the confiscation and this act, etc." The act certainly intended to operate only upon the interests of those who deserted the American cause and attached themselves to our enemies. It never intended, by confiscating the legal estate, a thing of no moment to Cossart, to deprive our own citizens of the trust estate. If compensation is to be made to the State by C. F. Cossart, because he attached himself to the enemies of our country, why involve in that compensation the rights of some of the citizens of the State, to whom in part that compensation is to be made? If this argument stands in need of any support, it may be derived from the proviso in the bill of rights before spoken of — the section of which this proviso is a part, declares that all of the territory, etc., of the State is the right and property of the people of this State. The State, however, did not think proper to interfere with or affect the titles or possessions which any of her citizens held or claimed under the laws before that time in use, or grants before that time issued. The possession of the lands in question by the U. F. or by persons claiming under them, which is the same thing, was a possession guarded by the proviso, as having been obtained in consequence of the issuing of a grant before that time, under the then existing laws of the country. Although affairs in North Carolina, as well as in the whole Union, had assumed a new aspect, the rights of individuals before that acquired were not forgotten. The same spirit of protection, which so strongly manifests itself in this section of our bill of rights, I am of opinion had *Page 362 
not taken its leave of our legislators when they passed the acts of confiscation. The 3d section of the Act of 1782, before spoken of, Martin's Collection of Private Acts, 105, declares that the power of attorney of C. F. Cossart, dated 3d of November, 1772, empowering said (438) F. W. Marshall to sell his lands, be admitted to probate, etc., registry in the county of Wilkes, and be as good and valid in law as it could or might have been had the act of confiscation never been passed. The intent of the Legislature, as far as it is discoverable in this act, was not to destroy but to secure the rights of the complainants to the lands in question. Did they intend to amuse them by saying that the power of attorney should be valid, etc., and at the same time deprive them of that in support of which they declared it should be valid? For my own part, I attribute to them no such duplicity. It is said in Vattel, Book 3d, ch. 13, p. 575, that formerly in conquests even individuals lost their lands, etc., but at present war is less terrible to the subject; things are transacted with more humanity; it is against one sovereign that another makes war, and not against quiet subjects. The conqueror lays his hands on the possessions of the State, etc., while private persons are permitted to retain theirs — they suffer but indirectly by war, and to them the result is, that they only change masters. If an adherence to this principle would have afforded protection and a security to the rights of our citizens, in case a conquest had been made of our State by some other or third nation, how much more strongly ought the principle to be adhered to, when the people of which the complainants are a part, became masters of it, and possessed the sovereign power. It may be said that the faith of the State is in some measure pledged to support the titles of the defendants.
Was the State consulted in one stage of the proceedings which the defendants have thought proper to adopt in procuring a title? If it were, I am a stranger to the fact. If they thought proper to enter these lands and obtain grants for them, knowing at the same time of the claim set up by the complainants, they must abide by the consequence — the act was their own. The fifth cause of demurrer has not been argued, and I suppose is not relied upon by the defendants. I think the whole demurrer should be overruled, except that part of it as to which leave has been given to amend.